**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| RICHARD CLARK and CLAIRMONT MORRISON, *individually and on behalf of others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD DUNCAN, VICE CHAIRPERSON AND ACTING SECRETARY OF THE GUIDIVILLE BAND OF POMO INDIANS OF THE GUIDIVILLE RANCHERIA, *in his official and individual capacities*; BRENDA JOYCE ESTVANDER, TREASURER OF THE GUIDIVILLE BAND OF POMO INDIANS OF THE GUIDIVILLE RANCHERIA, *in her official and individual capacities*; MICHAEL DERRY, *in his individual capacity only*; RYAN STOCK, *in his individual capacity only*; TAN OAK FINANCIAL; CLEARKLAKE HOLDINGS; and JOHN DOES NOS. 1-20, <br><br> Defendants. | Civil Action No. 3:21-cv-242 |

**CLASS ACTION COMPLAINT**

COMES NOW Plaintiffs, Richard Clark and Clairmont Morrison, *on behalf of themselves and all individuals similarly situated* ("Plaintiffs"), by counsel, and for their Class Action Complaint against Defendants, allege as follows:

**GENERAL ALLEGATIONS**

1.      This is a case about the making and collection of unlawful loans by several "Tribal Lending Businesses" formed by the "Guidiville Band of Pomo Indians of the Guidiville Rancheria (the "Guidiville Tribe" or the "Tribe"), a federally recognized Native American tribe. These loans

1

carry triple-digit interest rates, often in excess of 700%, and are illegal in many states such as Virginia where Plaintiffs reside.

2.     Predatory lenders target vulnerable borrowers and, left unregulated, can devastate borrowers and their communities. Consumers often renew the loans or take out new loans when they are unable to pay their original loans, creating a cycle of mounting debt.

3.     "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013). Commonly, these state laws will cap the amount of interest a lender is allowed to pay, such as the 12% interest rate cap established by Virginia's legislature. These laws not only protect vulnerable borrowers, but they also promote the "common good" as usury "weakens the social and economic foundations of a country." Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018).

4.     Although the Guidiville Tribe may be motivated by its intention of advancing its own community, its effort to advance the Tribe and its members exploits desperately poor people in other communities who, in their moment of despair, agree to take a small dollar loan with triple-digit interest rates. The excessive interest rates used by the Tribal Lending Businesses is far in excess of the interest rates permitted in the states where they make and collect on the loans. By entering into states such as Virginia to make loans to consumers and collect from their bank accounts, the Tribal Lending Businesses violated applicable state and federal law because it is well settled that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973).

2

5.     This lawsuit challenges Defendants' and others' ongoing collection of unlawful debts in Virginia through its usurious lending enterprise. Based on Defendants' conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. Defendants and others collected millions of dollars in unlawful debts and conspired with each other and others to repeatedly violate state lending laws resulting in the collection of unlawful debts from Plaintiffs and the class members. Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962(c)-(d).

6.     Plaintiffs also seeks declaratory relief that borrowers are not obligated to pay any outstanind principal or interest on these illegal loans. This claim is filed against Defendants Donald Duncan and Brenda Joyce Estvander in their official capacities and against Tan Oak Financial and Clearlake Holdings.

7.     Plaintiffs also seek to hold all Defendants liable in their individual capacities for monetary damages for violations of the Virginia Consumer Finance Act, Virginia's usury laws, for common law conspiracy to violate Virginia's usury laws, and for unjust enrichment.

## JURISDICTION AND VENUE

8.     The Court has original jurisdiction over Plaintiffs' RICO claims, 18 U.S.C. § 1965; 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims, 28 U.S.C. § 1367.

9.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District. Venue is also proper in this Court pursuant to 18 U.S.C. § 1965(a) because a civil action may be brought in a district court for "any district" where a person "resides, is found, has an agent, or transacts his affairs."  18 U.S.C. § 1965(a). Defendants have transacted their affairs in this District.

## PARTIES

10.     Plaintiff Richard Clark is a natural person residing in Richmond, Virginia.

11.     Plaintiff Clairmont Morrison is a natural person residing in Leesburg, Virginia.

12.     Upon information and belief, Defendant Donald Duncan is the Vice Chairperson and Acting Secretary of the Guidiville Band of Pomo Indians of the Guidiville Rancheria. He has been the Vice Chairperson for over 20 years. He is registered as a Secretary of Tan Oak Financial and Clearlake Holdings in Nevada business records.

13.     Upon information and belief, Defendant Brenda Joyce Estvander is the Treasurer of the Guidiville Band of Pomo Indians of the Guidiville Rancheria. She also serves as the Treasurer for all of the Guidiville Tribe's economic development entities that are arms of the Guidiville Tribe. She is registered as a Secretary of Tan Oak Financial and Clearlake Holdings in Nevada business records.

14.     Defendant Michael Derry holds positions with various tribal entities formed under tribal law. He is the CEO of Black Oak Development, a company wholly owned by the Tribe. Upon information and belief, he is not a tribal employee, meaning that he is not employed by the government of any tribe. Instead, he holds positions with businesses that are owned by tribes. Upon information and belief, he holds positions with several of the tribal lending businesses owned by the Guidiville Tribe, including the Tribal Lending Enterprise.

15.     Ryan Stock holds himself out as the Chief Executive Officer of Tan Oak Financial and the Director of Lending for Guidiville Indian Rancheria. He was previously the Chief Executive Officer of Clearklake Holdings, and Nevada business records reflect that he is the President of Clearlake Holdings. Upon information and belief, Ryan Stock is not a tribal employee, meaning that he is not an employee of the Guidiville Tribe. Instead, he holds positions with

businesses that are owned by the Guidiville Tribe.

16.     Tan Oak Financial is registered in Nevada as a District of Columbia corporation. Tan Oak Financial does business under the name "Tan Oak Lending," and holds itself out as an arm of the Guidiville Tribe and established under Tribal law. Plaintiffs were unable to locate registration information for Tan Oak Financial in the District of Columbia business entity records.

17.     Clearklake Holdings is registered in Nevada as a California corporation. Clearlake Holdings does business under the name Blue Horizon Loans and holds itself out as "wholly owned and operated" by the Guidiville Tribe and formed under Tribal law. Plaintiffs were unable to locate registration information for Clearklake Holdings in the California business entity records.

18.     Defendant John Doe Nos. 1-20 are unidentified parties who participated in the enterprise with the Defendants, including but not limited to entities who aided, abetted, and facilitated the conspiracy to collect the unlawful amounts from consumers.

## BACKGROUND

### A.  State licensing and usury laws protect consumers from Defendants' conduct.

19.     Plaintiffs received usurious loans from internet lending companies owned by the Guidiville Tribe.

20.     The usurious loans violated relevant state laws in two fundamental respects: (1) the loans were made without a license required by applicable state law; and (2) the loans included interest rates in excess of state interest rate caps.

21.     For example, Plaintiff Richard Clark received a loan with a triple digit interest rates of 703.97%. This violated both Virginia's licensing and usury laws, which prohibit a person from charging an annual percentage rate exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A)

22.     Similarly, Plaintiff Clairmont Morrison received a loan with an interest rate of 470.79%.

23.     The making and collecting on each of Plaintiffs' loans was a misdemeanor. *See* Va. Code Ann. § 6.2-1540.

24.     Because the loans were made in violation of the applicable licensing requirements, Plaintiffs' loans are void, and Plaintiffs were never obligated to pay any amount on the invalid loans. *See* Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made").

25.     Further, Virginia law provides Plaintiffs with a private right of action to recover all principal, interest, and any other charges from the loan ***and*** a penalty of twice the amount of any unauthorized or excessive charge received. Va. Code § 6.2-1542.

26.     Virginia's lending and usury protections are a part of a clearly delineated public policy against usurious loans and predatory lending. *See, e.g.*, Va. Code § 6.2-306(A).

27.     It is unsurprising that Virginia has enacted such laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009) (citing Christopher Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1116 n.13 (2008)).

28.     Unfortunately, despite the multitude of state and federal protections to prevent usurious lending, predatory financial services "are heavily marketed to financially vulnerable

consumers" as a means of obtaining quick cash for emergencies.[1] The collection of unlawful and usurious debt continues to be a major problem, in part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take the significant risk of litigation and liability for their violations of state and federal law.

### B. The tribal lending model was developed to evade state and federal consumer protections.

29.     In recent years, predatory lenders developed various schemes in an attempt to evade applicable state and federal protections.

30.     In one scheme—the so-called "rent-a-bank" strategy—payday lenders convinced banks headquartered in states with high (or nonexistent) usury limits to form a lending venture in order to capitalize on the fact that the bank was obligated to comply only with the usury law of its home state, even for loans made elsewhere.

31.     Federal banking regulators shut down these rent-a-bank schemes. Michael A. Stegman, *Payday Lending*, 21 *Journal of Economic Perspectives* 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory reaction).

32.     In response to the shut-down of the rent-a-bank scheme, several predatory lenders turned to a tribal lending model to facilitate their illegal lending businesses. Using this model, the predatory lender—which does most of its lending over the internet—affiliates with a Native American tribe to insulate itself from federal and state law by purporting to piggy-back on the tribe's sovereign legal status and its general immunity from suit under federal and state laws.

---

[1]  *See CFPB Finalizes Rule to Stop Payday Debt Traps*, CFPB (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

33.     In order to protect the non-tribal participants, the tribe will take certain precautions to protect the identity of the non-tribal participants and to make the business seem as if it is solely managed by and beneficial to the tribe.

34.     Common measures include creating a web of entities and tribal lenders, adopting tribal codes and regulations, and sometimes creating a tribal dispute resolution procedure.

35.     A central feature of the tribal business model is found in the consumer loan agreements consumers are required to execute as a condition of receiving the usurious loans. These loan agreements include a waiver of all state and federal rights and dispute resolution provisions. The non-tribal participants in the scheme will claim that they have no liability for their violations of state and federal laws because the loan agreements waive the application of all state and federal laws. They also often claim that they are beyond the reach of state and federal courts because of the forum selection and/or dispute resolution provision in the agreement.

36.     These provisions are obviously meant to protect the non-tribal participants from liability because the tribe itself is protected by its sovereign immunity.

37.     The strict enforcement of such agreements would often lead to absurd results, including the waiver of all state and federal rights and the inability of consumers to pursue any redress for the predatory lender's illegal conduct.

38.     Claims that the lending agreements waive the application of state and federal rights have been denied by courts across the country.[2]

---

[2] *See, e.g., Gibbs v. Stinson*, No. 3:18CV676, 2019 WL 4752792, at *14-18 (E.D. Va. Sept. 30, 2019); *see also Gingras v. Think Finance*, 922 F.3d. 112 (2d Cir. 2019); *Brice v. 7HBF No. 2, Ltd.*, No. 19-CV-01481-WHO, 2019 WL 5684529 (N.D. Cal. Nov. 1, 2019); *Brice v. Plain Green*, 372 F. Supp. 3d 955 (N.D. Cal. 2019); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 675 (4th Cir. 2016).

39.     Like the rent-a-bank scheme, this tribal lending model is highly problematic for a number of reasons. For example, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. And, it is settled law that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148 (1973).

40.     In recent years, these tribal lending schemes have come under increasing scrutiny from courts and regulators. Two prominent perpetrators were recently convicted and sentenced to prison for their roles.[3]

**C.  The enterprise was established to evade usury and licensing laws.**

41.     The Guidiville Tribe is a Native American tribal government that was federally recognized by a court decision in 1991. *See Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria et al. v. U.S.A.*, Civil No.C-86-3660-VRW (N.D. Cal. 1991).

42.     Since the 1991 decision, the Guidiville Tribe has acquired land east of Ukiah, California.

43.     In 2010, the Tribe's lawyer proposed that it pursue a payday lending business and introduced the Guidiville Tribe to "the godfather" of online payday lending, Charles Hallinan. [4]

---

[3] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

[4] The facts in this Complaint are largely based off of transcripts from the criminal trial of Charles Hallinan and Wheeler K. Neff. *United States v. Hallinan*, No. 2:16-cr-00130-ER (E.D. Pa.).

44.     Hallinan, who is currently serving a 14 year sentence in federal prison for his tribal lending businesses (including with the Guidiville Tribe),[5] was interested in creating the appearance that an existing payday lending operation had been purchased by a Native American tribe.

45.     The Guidiville Tribe's Tribal Council was interested in pursuing a payday lending enterprise with Hallinan, and thus, in and around 2010, the Tribal Council adopted resolutions and/or ordinances to facilitate the payday lending business with Hallinan, including adopting a regulatory code and establishing a business, "Tribal Lending Enterprise," to the be the licensee for Hallinan's payday lending business.

46.     In January 2011, the Tribal Council's Chairperson, Merlene Sanchez and Hallinan signed a binding letter of intent "to establish and operate a short-term consumer loan program for borrowers located throughout the United States."

47.     The letter of intent stated, "The consumer loans to be made in connection with the program are sometimes referred to as payday loans which involve short-term, high-interest rate loans made to U.S. consumers who do not have access to traditional forms of credit. These consumer loans are designed to provide consumers who have been denied credit from mainstream lenders with immediate emergency cash to cover unexpected short-term financial emergencies such as home and car repairs, as well as medical bills not covered by health insurance."

48.     It was understood that the Guidiville Tribe would establish a lending company under tribal law that would benefit from sovereign immunity.

49.     It was also understood that Hallinan would provide the capital for the loans and that he would control the "management company" that would "develop the lending standards, process

---

[5] Press Release, Dep't of Jus. U.S. Atty's Off. E.D. of Pa., Reputed Godfather of Payday Lending Sentenced to 168 months in Federal Prison (July 6, 2018), https://www.justice.gov/usao-edpa/pr/reputed-godfather-payday-lending-sentenced-168-months-federal-prison.

the loan applications, issue the loan proceeds, create the website for Internet advertising, and collect the consumer loans . . . ."

50.     The ordinance that was originally adopted by the Tribal Council included an annual interest rate cape of 36%. In February 2011, Hallinan's attorney, Wheeler K. Neff,[6] contacted Michael Derry, and expressed that the 36% interest rate cap would be a "deal killer" and would require Hallinan to "immediately move on to another tribe."

51.     Derry informed the Tribal Council of Hallinan's requirement with respect to the interest rate cap, and the Tribal Council subsequently amended their law and eliminated the 36% interest rate cap.

52.     Subsequently, the Tribe's Tribal Lending Enterprise entered into a series of agreements with Hallinan's companies to make it appear as if the Tribe had purchased Hallinan's loan portfolio from his existing business. However, in reality, the Tribe paid nothing and received nothing.

53.     Derry signed the sham agreements purporting to sell the loan portfolio to the Tribe's business, Tribal Lending Enterprise, for $10,000.

54.     The Tribal Lending Enterprise and Hallinan's companies also executed a series of agreements to facilitate the online lending business. Derry signed on behalf of the Tribal Lending Enterprise. These agreements provided that Hallinan's company would provide the money to fund the loans, Hallinan's company would have the option to buy back all of the consumer loans, and that Hallinan's companies would perform the day to day operations, including making, servicing, and collecting on the loans.

---

[6] Neff was sentenced to eight years in prison for his part in the illegal online lending businesses run by Hallinan. *See supra* Press Release at note 5.

55.     Under these agreements, the Guidiville Tribe received only 1% of the profits while Hallinan and his companies received exorbitant profits.

56.     In order to create the appearance that the tribal lending business took place on the reservation, Hallinan sent Derry a server that was to remain plugged in on the Tribe's land. Hallinan told Derry that the server's location on the Tribe's land was a "core component" of having a tribal lending business. Derry plugged the server in and placed it in a shed on the Tribe's land.

57.     Derry requested access to the contents of the server, but he was never permitted by Hallinan to access the "proprietary" information kept on it. However, in reality, the server did not contain any information about payday loans or borrowers and was not used in making the loans at all. It was merely another detail to further the illusion that the Tribe, and not Hallinan, was responsible for the illegal payday lending business.

**D.     The Guidiville Tribe expanded the payday lending enterprise.**

58.     After the establishment of the tribal lending business with Hallinan, the Guidiville Tribe expanded their business with other investors that entered into similar agreements with the tribal businesses.

59.     For example, Hallinan introduced Derry to Adrian Rubin[7] in or around September 2011. On behalf of the Tribe's business, Derry executed a sham loan portfolio purchase agreement that created the appearance that the Tribe's business had purchased Rubin's loan portfolio. Again, the Tribe paid nothing and received nothing.

---

[7] Rubin "was sentenced to 37 months' imprisonment and three years' supervised release, ordered to pay a $100,000 fine and $400 special assessment, and ordered to forfeit $9,621,800 in proceeds." *See* Press Release, Dep't of Jus. U.S. Atty's Off. E.D. of Pa., Co-Conspirator of Reputed "Godfather of Payday Lending" Sentenced to Prison and Ordered to Forfeit $9,621,800 (August 7, 2018), https://www.justice.gov/usao-edpa/pr/co-conspirator-reputed-godfather-payday-lending-sentenced-prison-and-ordered-forfeit. "Rubin admitted that he conspired with Hallinan and Neff to hide his payday lending behind a California-based Indian tribe for the purpose of circumventing state usury laws." *Id.*

60. The Tribe's businesses entered into many other arrangements with other investors.

61. In exchange for allowing the lending business to operate under its name, the Tribe would receive around 1-2% of the profits.

62. Neither the Tribe nor any of its businesses performed any of the day to day business of the payday lending business, instead "servicing companies" that were controlled by the investors would provide the money to fund the loans and would perform the day to day operations, including making, servicing, and collecting on the loans.

63. In other words, in order to protect non-tribal outsiders that are realizing the vast majority of the profits from the illegal lending enterprise, the Tribe adopted various ordinances and laws to be used by the illegal lending enterprise to support the tribal lenders' misleading claims of sovereign immunity.

64. Additionally, Defendants, the Tribe, and others, used creative contracting to allow for the vast majority of the revenues of the lending business to be realized by third parties not yet known to Plaintiffs, while Tribal businesses can technically claim that all of the revenues are benefitting the tribe. Upon information and belief, these contracts are written with the intent of deceiving regulators and courts regarding the true nature of the business.

65. Upon information and belief, a large portion of the profits are paid to these non-tribal outsiders. For example, similar tribal lending enterprises have used a "service fee" to transfer the vast majority of the profits to non-tribal outsiders. By structuring the business in this manner, the tribe would be able to claim that all of the net revenues of the business were benefitting the tribe, even though the tribe was really receiving much less than the full portion of the profits.

66. Derry has testified that the Tribe's businesses have entered into several of these contracts where the Tribe was only receiving 1-2%.

67.     Defendants, the Tribe, and their conspirators understand that their business if legally problematic and that they may not violate other states usury laws without consequence.

68.     In fact, in 2012, Hallinan and others were becoming increasingly concerned that regulators were uncovering the use of the tribal lending model as a means to evade consumer protection laws.

69.     Accordingly, Hallinan and Derry revised the servicing agreement between the Tribal Lending Enterprise and Hallinan's businesses to falsely represent that the Tribe was receiving approximately half of the profits, even though the Tribe was still only receiving 1-2% of the profits.

70.     When Hallinan and Derry were discussing the revisions, Derry proposed an edit that would falsely reflect the Tribe was making almost all the profits. However, Neff responded that he thought that such an arrangement would be counterproductive because it would seem unbelievable on its face.

71.     Upon information and belief, the Tribe has entered into similar servicing agreements with other investors that falsely represents the profits to the Tribe.

72.     In addition to Tribal Lending Enterprise, the Tribal Council has also established Clearlake Holdings and Tribal Venture Management Group to facilitate the illegal lending enterprise.

73.     Upon information and belief, these business and other lending businesses formed by the Tribe are operated and managed primarily by non-tribal participants in the illegal lending enterprise—although Tribal Council retains authority to cease the operations of each business.

74.     Upon information and belief, Tribal Lending Enterprise has made and collected on usurious loans under various names, including National-Paydayloan.com.

75.     Upon information and belief, Clearlake Holdings makes and collect on usurious loans under various names, including Blue Horizon Lending, Tan Oak Lending, and MultiLoanSource.net.

76.     Upon information and belief, Tribal Venture Management Group has made and collected on usurious loans under various names, including e-cash-advance.com.

77.     Other businesses formed by the Tribe have made and collected on usurious loans under various other names, including Affordable Loan Services, American Credit Line, Arrow Credit Line, Best Choice 123, E-Cash Advance, Gallery Cash Now, Money King Loans, Money Loans Quick, Nations Cash Online, Pacific Cash Online, Quick Cash Ahead, The Loansmith, United Credit Line, and Path Lending.

78.     Upon information and belief, a significant portion of the lending operations done under these names are operated by third parties that are not located on tribal lands. Thus, it is non-tribal outsiders that handle and control the underwriting, risk assessment, compliance, customer complaints, accounting, lead generation, collections, and website management for the business.

79.     Upon information and belief, the establishment of Tribal Lending Enterprise, Clearlake Holdings, Tribal Venture Management Group, and other similar businesses established by the Tribe was prompted in part by the government crackdown on illegal lending businesses in 2008-2011 and by the increase of tribal lending businesses in 2012.

80.     Upon information and belief, Defendants, the Tribe, the Tribal Council, and others not yet known to Plaintiffs have joined one or more association in fact enterprises with individuals outside of the tribe and non-tribal investors to collect on usurious loans throughout the country.

81.     Defendants, the Tribe, the Tribal Council, and others agreed to establish the illegal lending businesses in order to make and collect on illegal loans in violation of state usury and licensing requirements.

82.     Upon information and belief, the Tribal businesses create so many different electronic storefronts to facilitate the illegal lending enterprises and the distribution of the profits from the illegal loans to the various nontribal outsiders who are involved.

83.     As alleged, a large portion of the profits made under these names did not go to the Tribe or the Tribal businesses but, instead, went to nontribal outsiders such as Hallinan who paid for the affiliation with the Tribe to protect themselves from liability of their violations of state and federal laws.

84.     Upon information and belief, Defendants, the Tribe, Tribal Council, and others agreed that the Tribal businesses would use money provided by nontribal participants in the enterprise to make consumer loans using excessive interest rates far in excess of the amount required by state law.

85.     As alleged, nontribal participants exerted significant control over the lending business.

86.     Upon information and belief, Defendants Donald Duncan and Brenda Joyce Estvander were instrumental in furthering the illegal lending business and agreed to the collection of unlawful debt.

87.     Upon information and belief, as members of the Tribal Council, Defendants Donald Duncan and Brenda Joyce Estvander have been apprised of the various electronic storefronts of the Tribal businesses.

88. Additionally, upon information and belief, Defendants Donald Duncan and Brenda Joyce Estvander have engaged in the collection of unlawful debt through their roles as board members of one or more of the Tribal businesses engaged in the illegal lending enterprise, including as Secretaries for ClearLake Holdings and Tan Oak Financial.

89. As members of the Tribal Council, Defendants Donald Duncan and Brenda Joyce Estvander have the authority to direct the affairs and control the Tribal businesses even if non-tribal third parties are permitted to exert significant control over the lending business.

90. Upon information and belief, the Tribal businesses continue to make and collect on illegal loans in part because Defendants Donald Duncan, Brenda Joyce Estvander, and the other members of the Tribal Council allow the illegal conduct to continue.

91. Additionally, upon information and belief, Defendant Ryan Stock was instrumental in furthering the illegal lending enterprise and various operating names.

92. Ryan Stock also agreed to the collection of unlawful debt by ClearLake Holdings and Tan Oak Financial.

93. Upon information and belief, as the Chief Executive Officer of Tan Oak Financial and the Director of Lending for the Guidiville Indian Rancheria, Defendant Ryan Stock has engaged in the collection of unlawful debt, including through approving the creation of subsidiaries to engage in the making and collecting of unlawful debt, registering Tan Oak Financial and Clearlake Holdings as business entities in Nevada, and establishing an office in Nevada to facilitate the illegal lending enterprise.

94. As the Chief Executive Officer of Tan Oak Financial and the Director of Lending for the Guidiville Indian Rancheria, Defendant Ryan Stock has directed the affairs and controlled Tan Oak Financial and Clearlake Holdings.

17

95.     Additionally, as alleged, Defendant Michael Derry was instrumental in establishing and furthering the illegal lending business and agreed to the collection of unlawful debt.

96.     In his capacity for Tribal Lending Enterprise and as the CEO at Black Oak Development, Michal Derry has engaged in the collection of unlawful debt.

97.     Without Defendants' participation in the enterprise, Plaintiffs' loans never would have been made and collected on.

98.     The tribal lending businesses often include a disclaimer such as the following:

> Tan Oak Lending is a licensed tribal lending corporation, wholly owned by the Guidiville Indian Rancheria, a sovereign nation located within the United States Of America and operating within the Tribe's land.

99.     However, upon information and belief, the lenders, such as Tan Oak Financial, are not operating solely on the Tribe's reservation. Further, the disclaimer gives the appearance that the lender is "wholly owned" by the Tribe. While this may be technically true, it is nontribal outsiders—not the Tribe—that handles and controls the underwriting, risk assessment, compliance, accounting, lead generation, collections, and website management for the business. The non-tribal outsiders also carry the risk associated with the loans and receive the vast majority of the profits—just as Hallinan did.

100.    Thus, these statements were designed to mislead consumers that they are borrowing from a lender that is wholly owned and operated by a sovereign nation and deter consumers from seeking claims for the abusive lending and collection practices used by the company.

101.    Similar misleading statements were also made in the lending agreements between the Tribal Lending Businesses and the consumers.

102.    For example, Plaintiff Clairmont Morrison's lending agreement with Clearlake Holdings waives the application of all law other than Tribal law.

103.     Additionally, his lending agreement limits the resolution of any claims through an administrative appeal to the Tribal Regulatory Authority request that may only be appealed to a "Tribal Court."

104.     Upon information and belief, the Guidiville Tribe established the Tribal Regulatory Authority to facilitate the illegal lending business.

105.     Additionally, upon information and belief, no Tribal Court exists to consider the Tribal Regulatory Authority decisions.

106.     Upon information and belief, the waiver of all federal and state laws and the sham dispute resolution system was included in the lending agreements to facilitate the illegal lending business.

107.     Each of Defendants, the Tribal Council, and the Tribe understand that the illegal lending business engages in usurious lending in violation of state and federal law and engages in multiple abusive practices.

108.     Additionally, each of Defendants is aware that numerous consumers have complained regarding abusive lending practices used by the lending business. For example, the Washington State Department of Financial Institutions has issued alerts about unlicensed lending conducted by Tribal Lending Enterprise, Clearlake Holdings, Affordable Loan Services, and Tribal Venture Management Group.[8]

---

[8] See Tribal Lending Enterprises dba National-Paydayloan.com - Tribal Payday Lender, (Oct. 22, 2014), https://dfi.wa.gov/consumer/alerts/tribal-lending-enterprises-dba-national-paydayloancom-tribal-payday-lender; MultiLoanSource.net Not Licensed In Washington, (Nov. 18, 2015), https://dfi.wa.gov/consumer/alerts/multiloansourcenet-not-licensed-washington; Affordable Loan Services Not Licensed In Washington, (Aug. 15, 2014), https://dfi.wa.gov/consumer/alerts/affordable-loan-services-not-licensed-washington; Tribal Venture Management Group Not Licensed In Washington, (Mar. 15, 2013), https://dfi.wa.gov/consumer/alerts/tribal-venture-management-group-not-licensed-washington.

**D.** **Defendants and others collected unlawful interest from consumers.**

109. Defendants, together with others not yet known to Plaintiffs, marketed, initiated, and collected usurious loans throughout the country, including in Virginia.

110. Defendants knew the loans were illegal under Virginia's usury and licensing laws, but they pursued the scheme anyway.

111. They charged astronomical interest rates that far exceeded the rates allowed by Virginia law.

112. Upon information and belief, all of Defendants' loans to consumers used excessive interest rates far in excess of Virginia law. Upon information and belief, the Tribal businesses typically uses triple digit interest rates, sometimes in excess of 700%.

113. Accordingly, the loans were null and void under Virginia law, and it is unlawful for Defendants, the Tribal Lending Businesses, and any of their affiliates to collect or receive any principal, interest or charges whatsoever on said loans, including any amounts paid by Plaintiffs.

114. For example, Defendant Richard Clark applied for and received a Tan Oak Lending loan from a personal electronic device while located in Virginia.

115. Mr. Clark used his Virginia address when applying for the loans, and he used his Virginia Credit Union bank account with a Virginia ABA routing number to receive the loans and for the subsequent ACH debits to pay down the loans.

116. Mr. Clark's lending agreement with Tan Oak Lending states with finality that he was entering into the agreement upon signing and includes the date of his execution of his agreement and IP address for his signature.

117. The loans issued to Mr. Clark uses an annual interest rate of 703.97%.

118.    Defendants, together with others in the illegal lending enterprise, received no less than $365.60 from Mr. Clark in connection with the Tan Oak Lending loan issued to him.

119.    Defendant Clairmont Morrison applied for and received a Clearlake Holdings loan from a personal electronic device while located in Virginia.

120.    Mr. Morrison used his Virginia address when applying for the loans.

121.    Mr. Morrison's lending agreement states with finality that he was entering into the agreement upon signing and includes the date of his execution of the agreement.

122.    Mr. Morrison was charged an annual percentage rate of over 470.79%.

123.    Defendants, together with others in the illegal lending enterprise, received no less than $1,945.55 from Mr. Morrison in connection with the ClearLake Holdings loan issued to him.

124.    Additionally, Clearlake Holdings is reporting Mr. Morrison's loan to at least one credit reporting agency. Even though it knows that the loan is void under Virginia law, it reports the amount and status of the loan as if it were valid.

125.    In an email attempting to collect from Mr. Morrison, it states that negative credit reporting by Blue Horizon Loans could lead to a denial of access to credit.

126.    Because Plaintiffs' debts were invalid, Defendants and their co-conspirators had no authority under any agreement or law to collect any amount from Plaintiffs.

127.    It is also inaccurate to report the debts to consumer reporting agents because the debts are invalid.

128.    Defendants continue to charge interest to Plaintiffs' loans, illegally added more interest to the amount of the debt.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of RICO, 18 U.S.C. § 1962(c)
### (CLASS CLAIM AGAINST ALL DEFENDANTS
### IN THEIR INDIVIDUAL CAPACITIES ONLY)

129.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

130.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of the "RICO Class," initially defined as follows:

> *All individuals living in Virginia who entered into a loan agreement with a tribal lending corporation owned by the Guidiville Tribe, including Tribal Lending Enterprise, National-Paydayloan, Clearlake Holdings, Blue Horizon Lending, Tan Oak Lending, MultiLoanSource.net, Tribal Venture Management Group, e-cash-advance.com, Affordable Loan Services, American Credit Line, Arrow Credit Line, Best Choice 123, E-Cash Advance, Gallery Cash Now, Money King Loans, Money Loans Quick, Nations Cash Online, Pacific Cash Online, Quick Cash Ahead, The Loansmith, United Credit Line, and Path Lending.*

Plaintiffs are members of the RICO Class.

131.    **Numerosity. Fed. R. Civ. P 23(a)(1).** At this time, Plaintiffs do not know the exact number of members of the RICO Class. However, based on the class sizes in similar cases, Plaintiffs anticipate that there are likely thousands of members. Thus, the class is so numerous that joinder of all members is impracticable.

132.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an association-in-fact enterprise existed; (2) whether Defendants conducted the affairs or participated in the enterprise's affairs; (3) whether the loans are "unlawful debt" for purposes of

RICO; (4) whether Defendants violated RICO by collecting on the loans; and (5) what is the proper recovery for Plaintiffs and the class members against Defendants.

133.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

134.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are an adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

135.     **Superiority. Fed. R. Civ. P. 23(b).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the

litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

136.    As alleged, Defendants, the Guidiville Tribe, the Guidiville Tribal Council, and others established one or more association in fact enterprises to evade state usury laws.

137.    Defendants are each being sued in their individual capacities for their own conduct violating RICO, 18 U.S.C. § 1962(c).

138.    Plaintiff also asserts this count against Defendants John Doe Nos. 1-20 who are unidentified parties who participated in the enterprise with Defendants.

139.    Defendants are each a "person" as that term is defined in 18 U.S.C. § 1964(3).

140.    Defendants violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

141.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).

142.    All of the loans made to RICO Class members and collected by Defendants and Defendants co-conspirators included interest rates far in excess of Virginia's interest rate cap.

143.    As alleged, each of Defendants participated in the collection of unlawful debt.

144.    Plaintiffs and the RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise which would not have been made but for Defendants' conduct.

145.    Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**SECOND CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS**
**IN THEIR INDIVIDUAL CAPACITIES ONLY)**

146.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

147.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of the "RICO Class," initially defined as follows:

> *All individuals living in Virginia who entered into a loan agreement with a tribal lending corporation owned by the Guidiville Tribe, including Tribal Lending Enterprise, National-Paydayloan, Clearlake Holdings, Blue Horizon Lending, Tan Oak Lending, MultiLoanSource.net, Tribal Venture Management Group, e-cash-advance.com, Affordable Loan Services, American Credit Line, Arrow Credit Line, Best Choice 123, E-Cash Advance, Gallery Cash Now, Money King Loans, Money Loans Quick, Nations Cash Online, Pacific Cash Online, Quick Cash Ahead, The Loansmith, United Credit Line, and Path Lending.*

Plaintiffs are members of the RICO Class.

148.    **Numerosity. Fed. R. Civ. P 23(a)(1).** At this time, Plaintiffs do not know the exact number of members of the RICO Class. However, based on the class sizes in similar cases, Plaintiffs anticipate that there are likely thousands of members. Thus, the class is so numerous that joinder of all members is impracticable.

149.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The common questions include: (1)

whether an association-in-fact enterprise existed; (2) whether Defendants knew of and agreed to the overall objective to collect unlawful debt; (3) whether the loans are "unlawful debt" for purposes of RICO; and (4) what is the proper recovery for Plaintiffs and the class members against Defendants.

150.  **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

151.  **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are an adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Plaintiffs and their counsel do not have any interests that would cause them to not vigorously pursue this action.

152.  **Superiority. Fed. R. Civ. P. 23(b).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by

Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

153.    Defendants are each being sued in their individual capacities for their conduct violating RICO, 18 U.S.C. § 1962(d).

154.    Plaintiffs also assert this count against Defendants John Doe Nos. 1-20 who are unidentified parties who participated in the enterprise with Defendants.

155.    Defendants violated § 1962(d) of RICO by conspiring to violate § 1962(c).

156.    Defendants each knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under Virginia law.

157.    This is evidenced in part by their knowledge of and agreement to the collection of unlawful debt at rate in excess of state interest rate caps, including in Virginia.

158.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

159.    Defendants are jointly and severally liable in their individual capacities to Plaintiffs and the RICO Class for actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**THIRD CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(CLASS CLAIM AGAINST DONALD DUNCAN, *IN HIS OFFICIAL CAPACITY* AS
VICE CHAIRPERSON AND ACTING SECRETARY OF THE GUIDIVILLE BAND OF
POMO INDIANS OF THE GUIDIVILLE RANCHERIA; BRENDA JOYCE
ESTVANDER, *IN HER OFFICIAL CAPACITY* AS TREASURER OF THE GUIDIVILLE
BAND OF POMO INDIANS OF THE GUIDIVILLE RANCHERIA; TAN OAK
FINANCIAL; and CLEARKLAKE HOLDINGS)**

160.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

161.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of the "Declaratory Judgment Class," initially defined as follows:

> *All individuals living in Virginia and who entered into a loan agreement with a tribal lending corporation owned by the Guidiville Tribe, including Tribal Lending Enterprise, National-Paydayloan, Clearlake Holdings, Blue Horizon Lending, Tan Oak Lending, MultiLoanSource.net, Tribal Venture Management Group, e-cash-advance.com, Affordable Loan Services, American Credit Line, Arrow Credit Line, Best Choice 123, E-Cash Advance, Gallery Cash Now, Money King Loans, Money Loans Quick, Nations Cash Online, Pacific Cash Online, Quick Cash Ahead, The Loansmith, United Credit Line, and Path Lending.*

Plaintiffs are members of the Declaratory Judgment Class.

162.    **Numerosity. Fed. R. Civ. P 23(a)(1).** At this time, Plaintiffs do not know the exact number of members of the Declaratory Judgment Class. However, based on the class sizes in similar cases, Plaintiffs anticipate that there are likely thousands of members. Thus, the class is so numerous that joinder of all members is impracticable.

163.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The common questions include: (1)

whether the loans are valid and (2) whether the loans are collectable.

164.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

165.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them not to vigorously pursue this action.

166.    **Superiority. Fed. R. Civ. P. 23(b).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual members of the class to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

167.    Virginia law requires all who engage in the business of making personal loans to be licensed.

168.    None of the Tribe's businesses nor its subsidiaries or servicers were licensed to make loans in Virginia.

169.    Because the loans were made without the required license and charged excessive interest rates, the loans are null and void.

170.    In addition to licensing violations, the loans violated the general usury of Virginia, including its anti-waiver statute.  *See* Va. Code § 6.2-306.

171.    Plaintiffs and members of the class are subject to ongoing harm absent a declaration that the loans were void, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

172.    The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the Loan Agreements as well as the validity, if any, of the choice of law and forum-selection provisions.

173.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

174.    Accordingly, Plaintiffs seek a declaratory judgment that the loan agreements are invalid and that the loans are uncollectable.

### FOURTH CAUSE OF ACTION
**VIOLATIONS OF VIRGINIA'S CONSUMER FINANCE ACT
(CLASS CLAIM AGAINST DONALD DUNCAN, *IN HIS OFFICIAL CAPACITY* AS VICE CHAIRPERSON AND ACTING SECRETARY OF THE GUIDIVILLE BAND OF POMO INDIANS OF THE GUIDIVILLE RANCHERIA; BRENDA JOYCE ESTVANDER, *IN HER OFFICIAL CAPACITY* AS TREASURER OF THE GUIDIVILLE BAND OF POMO INDIANS OF THE GUIDIVILLE RANCHERIA; TAN OAK FINANCIAL; and CLEARKLAKE HOLDINGS)**

175.   Plaintiff Clark realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

176.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Clark brings this action for himself and on behalf of a Virginia Class defined as follows:

> *All individuals living in Virginia who entered into a loan agreement with a tribal lending corporation owned by the Guidiville Tribe, including Tribal Lending Enterprise, National-Paydayloan, Clearlake Holdings, Blue Horizon Lending, Tan Oak Lending, MultiLoanSource.net, Tribal Venture Management Group, e-cash-advance.com, Affordable Loan Services, American Credit Line, Arrow Credit Line, Best Choice 123, E-Cash Advance, Gallery Cash Now, Money King Loans, Money Loans Quick, Nations Cash Online, Pacific Cash Online, Quick Cash Ahead, The Loansmith, United Credit Line, and Path Lending.*

Plaintiff Clark is a member of the Virginia Class.

177.   **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

178.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

179.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the members of the class he seeks to represent; he has retained counsel competent and experienced in such litigation; and he has and intends to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the

members of the class. Neither Plaintiff nor his counsel have any interests which might cause them to not vigorously pursue this action.

180.     **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants obtained a license to lend in Virginia; (2) whether Defendants' loans violate the Virginia Consumer Finance Act; (3) whether Tan Oak Financial and Clearlake Holdings are liable under Va. Code Ann. § 6.2-1541; and (4) whether and what injunctive relief is appropriate for Plaintiffs and each class member.

181.     **Declaratory Relief**. **Fed. R. Civ. P. 23(b)(2).** Defendants have acted or refused to act on grounds that apply generally to the class, rendering declaratory relief appropriate respecting the class as a whole.

182.     As alleged herein, Plaintiffs loans were void *ab initio* because they violated Virginia's licensing and usury requirements in addition to violating Virginia's public policy and using unconscionable terms.

183.     Plaintiff Clark has an outstanding balances on his loan.

184.     Because of the triple digit interest rates used by the Tribal Lending Businesses, Plaintiffs are subject to significant liability as the interest accrues on their unpaid debts.

185.     Additionally, they are subject to continued negative credit reporting.

186.     Plaintiff Clark, on behalf of himself and all others similarly situated, further seeks a declaratory judgment that borrowers are not obligated to pay any principal or interest outstanding on the illegal loans. *See* Va. Code Ann. § 6.2-1541.

187.    Plaintiff Clark further seeks injunctive relief from Donald Duncan, *in his official capacity* as Vice Chairperson and Acting Secretary of the Guidiville Band of Pomo Indians of the Guidiville Rancheria; Brenda Joyce Estvander, in her official capacity as Treasurer of the Guidiville Band Of Pomo Indians of the Guidiville Rancheria; Tan Oak Financial; and Clearklake Holdings: (1) prohibiting the them from continuing to collect on the unlawful loans in Virginia, (2) requiring them to send notice to Virginia consumers indicating that their loans are void; (3) prohibiting them from selling the unlawful loans to third-party debt collectors; and (4) prohibiting them from making any loans in Virginia in excess of 12% interest.

## FIFTH CAUSE OF ACTION
### VIOLATIONS OF VIRGINIA'S USURY LAWS AND CONSUMER FINANCE ACT
### (CLASS CLAIMS AGAINST TAN OAK FINANCIAL; CLEARKLAKE HOLDINGS; and JOHN DOES 1-20)

188.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

189.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a Virginia Class defined as follows:

> *All individuals living in Virginia who entered into a loan agreement with a tribal lending corporation owned by the Guidiville Tribe, including Tribal Lending Enterprise, National-Paydayloan, Clearlake Holdings, Blue Horizon Lending, Tan Oak Lending, MultiLoanSource.net, Tribal Venture Management Group, e-cash-advance.com, Affordable Loan Services, American Credit Line, Arrow Credit Line, Best Choice 123, E-Cash Advance, Gallery Cash Now, Money King Loans, Money Loans Quick, Nations Cash Online, Pacific Cash Online, Quick Cash Ahead, The Loansmith, United Credit Line, and Path Lending.*

Plaintiffs are members of the Virginia Class.

190.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained

33

by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

191. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

192. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

193. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants' loans violate state usury laws, such as Va. Code § 6.2-305 because the interest levels were too high; (2) whether Defendants' loans also violated Virginia's Consumer Finance Act; and (3) what is the proper recovery for Plaintiffs and the class members.

194. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome

and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

195.     Plaintiffs received loans that violate Virginia's general usury laws and Consumer Finance Act. Va. Code § 6.2-305(A); Va. Code § 6.2-1501.

196.     Defendants Clearlake Holdings, Tan Oak Financial, and John Does 1-20 received amounts collected from consumers.

197.     As a result, Plaintiffs and the class members are entitled to recover the total amount of interest received, plus twice the amount of interest paid within the past two years. Va. Code § 6.2-305(A). Plaintiffs and class members are further entitled to recover all amounts repaid against Clearlake Holdings and Tan Oak Financial under Virginia's Consumer Finance Act. Va. Code § 6.2-1541(B).

**<u>SIXTH CAUSE OF ACTION</u>**
**COMMON LAW CIVIL CONSPIRACY CLAIM**
**(CLASS CLAIMS AGAINST DONALD DUNCAN, *IN HIS INDIVIDUAL CAPACITY ONLY*,  BRENDA JOYCE ESTVANDER, *IN HER INDIVIDUAL CAPACITY ONLY*; MICHAEL DERRY, *IN HIS INDIVIDUAL CAPACITY ONLY*; RYAN STOCK, *IN HIS INDIVIDUAL CAPACITY ONLY*; AND JOHN DOES NOS. 1-20 )**

198.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

35

199.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a Virginia Class defined as follows:

> *All individuals living in Virginia who entered into a loan agreement with a tribal lending corporation owned by the Guidiville Tribe, including Tribal Lending Enterprise, National-Paydayloan, Clearlake Holdings, Blue Horizon Lending, Tan Oak Lending, MultiLoanSource.net, Tribal Venture Management Group, e-cash-advance.com, Affordable Loan Services, American Credit Line, Arrow Credit Line, Best Choice 123, E-Cash Advance, Gallery Cash Now, Money King Loans, Money Loans Quick, Nations Cash Online, Pacific Cash Online, Quick Cash Ahead, The Loansmith, United Credit Line, and Path Lending.*

Plaintiffs are members of the Virginia Class.

200.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

201.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

202.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

203.    **<u>Predominance of Common Questions of Law and Fact</u>. Fed. R. Civ. P. 23(a)(2).**
Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants' loans violate Va. Code § 6.2-305 because the interest levels were too high and (2) what is the proper recovery for Plaintiffs and the class members

204.    **<u>Superiority</u>. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

205.    As alleged, Plaintiffs received loans that violate Virginia's general usury laws. Va. Code § 6.2-305(A).

206.    Defendants Clearlake Holdings, Tan Oak Financial, and John Does 1-20 received amounts collected from consumers.

207.    As alleged, Defendants Donald Duncan, Brenda Joyce Estvander, Michael Derry, and Ryan Stock each agreed to the collection of unlawful debt by Clearlake Holdings, Tan Oak Financial, and others. Upon information and belief, discovery will demonstrate that each of these defendants, through their supervisory roles over the Tribe's businesses, by signing servicing agreements, and by negotiating such agreements, each of Defendants Donald Duncan, Brenda Joyce Estvander, Michael Derry, and Ryan Stock agreed to the triple digit interest rates in violation of Va. Code § 6.2-305(A).

208.    As a result, Plaintiffs seek damages against Defendants Donald Duncan, Brenda Joyce Estvander, Michael Derry, and Ryan Stock for the injuries they sustained as a result of the conspiracy to violate Virginia's usury laws.

## SEVENTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (CLASS CLAIMS AGAINST ALL DEFENDANTS
### IN THEIR INDIVIDUAL CAPACITIES ONLY)

209.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

210.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Unjust Enrichment Class"—initially defined as follows:

> *All individuals living in Virginia who made a payment on any loan agreement entered into with a tribal lending corporation owned by the Guidiville Tribe, including Tribal Lending Enterprise, National-Paydayloan, Clearlake Holdings, Blue Horizon Lending, Tan Oak Lending, MultiLoanSource.net, Tribal Venture Management Group, e-cash-advance.com, Affordable Loan Services, American Credit Line, Arrow Credit Line, Best Choice 123, E-Cash Advance, Gallery Cash Now, Money King Loans, Money Loans Quick, Nations Cash Online, Pacific Cash Online, Quick Cash Ahead, The Loansmith, United Credit Line, and Path Lending.*

Plaintiffs are members of the Unjust Enrichment Class.

211. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

212. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants when they paid a void loan; (2) whether Defendants knew or should have known of the benefit; (3) whether Defendants retained an unjust benefit because the loan was void; and (4) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

213. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

214. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the

members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

215.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

216.    All loans made to consumers in Virginia were void and unenforceable.

217.    Plaintiffs conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefit; and they have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

218.    Accordingly, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid by Virginia consumers on any loans with one of the Tribal Lending Businesses owned by the Guidiville Tribe.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against

Defendants as follows:

      A.      An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2), and (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

      B.      An Order declaring that the loan agreements are void and that Plaintiffs and members of the putative class are not obligated to pay any outstanding balances on the loans;

      C.      An Order awarding monetary damages against Defendants in their individual capacities, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

      D.      An Order awarding statutory damages against Defendants in their individual capacities in accordance with proof and in an amount consistent with applicable precedent;

      E.      An Order awarding interest at the maximum allowable legal rate against Defendants, in their individual capacities on the foregoing sums;

      F.      An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees against Defendants, in their individual capacities; and

      G.      Such further relief as this Court may deem just and proper.

**TRIAL BY JURY IS DEMANDED**

                            Respectfully submitted,
                            **PLAINTIFFS**

                            By:    */s/ Kristi C. Kelly*
                            Kristi C. Kelly, Esq., VSB #72791
                            Andrew J. Guzzo, Esq., VSB #82170
                            Casey S. Nash, VSB #84261
                            KELLY GUZZO, PLC
                            3925 Chain Bridge Road, Suite 202
                            Fairfax, VA 22030
                            (703) 424-7572
                            (703) 591-0167 Facsimile

Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
*Counsel for Plaintiffs*